JUDGE CEDARBAUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA BOLAND and ANNA MOLIN, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| MERRILL LYNCH & CO., INC., E. STANLEY O'NEAL, CAROL T. CHRIST, ARMANDO M. CODINA, VIRGIS W. COLBERT, JILL K. CONWAY, ALBERTO CRIBIORE, JOHN D. FINNEGAN, JUDITH MAYHEW JONAS, DAVID K. NEWBIGGING, AULANA L. PETERS, JOSEPH W. PRUEHER, ANN N. REESE, CHARLES O. ROSSOTTI, LOUIS DIMARIA, PETER STINGI and JOHN AND JANE DOES 1-20, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | |

07 CV 11054

**Case No.**

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**



RECEIVED
DEC 06 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Barbara Boland and Anna Molin ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and forth their Complaint against Defendants state and allege as follows:

## I. NATURE OF THE ACTION

1.      Plaintiffs bring this suit as a civil enforcement action under the Employee Retirement Income Security Act ("ERISA") §§ 502(a)(2), (3), 29 U.S.C. §§ 1132(a)(2), (3), for relief on behalf of the Merrill Lynch & Co., Inc. 401(k) Savings and Investment Plan (the "SIP"), the Merrill Lynch & Co., Inc. Retirement Accumulation Plan (the "RAP"), and the Merrill Lynch & Co., Inc. Employee Stock Ownership Plan (the "Traditional ESOP") (collectively, the "Plans") operated and established by Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company") as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals.

2.      Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets from January 18, 2007 to the present (the "Class Period").

3.      Plaintiffs allege that Defendants allowed the heavy, imprudent investment of the Plans' assets in Merrill Lynch common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to Company's serious mismanagement and improper business practices, including, among other practices: (a) Merrill Lynch's exposure to collaterized debt obligations ("CDO") and subprime investment losses was substantial and significant; (b) Merrill Lynch operated without the requisite internal controls to determine the Company's risky position as to its and subprime

mortgage investments; (c) Merrill Lynch understood, at all relevant times, that its CDO and subprime-investment related risks, so that the Company did not properly disclose the losses facing Merrill Lynch, and in turn Plan participant and beneficiaries; and (d) Merrill Lynch failed to alert Plan participants and beneficiaries of the fact that heavy investment of retirement savings in the Company's stock not only could, but inevitably would result in significant losses to the Plans when it could no longer sustain its CDO and sub-prime investments, all of which caused Merrill Lynch's financial statements to be misleading and which artificially inflated the value of shares of Merrill Lynch stock and the Merrill Lynch Stock Fund in the Plans ("Fund"). In short, during the Class Period, the Company was seriously mismanaged and faced deteriorating financial circumstances that rendered Merrill Lynch stock an unduly risky and inappropriate investment option for participants' retirement savings.

4.    Specifically, Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the Plans' assets breached their fiduciary duties to the Plans' participants in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Merrill Lynch stock. In Count II, Plaintiffs allege that the Defendants, who were responsible for the selection, monitoring and removal of the Plans' other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count III, Plaintiffs allege that the Defendants breached their duty to inform the Plans' participants by failing to provide complete and accurate information regarding the soundness of Merrill Lynch stock and the prudence of investing and holding retirement contributions in Merrill Lynch equity. In Count IV, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other

fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

5.    As Merrill Lynch's financial conditions became known to the market, its stock fell from $95.40 on January 18, 2007, to $61.40, at the close of the market on October 24, 2007—a drop of approximately 36% in share price. When Merrill Lynch admitted on November 7, 2007, that it was under investigation by the United States Securities and Exchange Commission ("SEC") for hiding its exposure to the sub-prime market, the stock fell again to $53.99. Overall, the Company's stock price has declined approximately 45% during the Class Period.

6.    As more fully explained below, during the Class Period, Defendants imprudently permitted the Plans to hold and acquire billions of dollars in Merrill Lynch stock despite the fundamental problems the Company faced. Based on publicly available information for the Plans, it appears that Defendants' breaches have caused the Plans to lose nearly *2 billion dollars* of retirement savings.

7.    This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

8.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as the Plaintiffs to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P.

23 on behalf of all participants and beneficiaries of the Plans whose Plan accounts were invested in Merrill Lynch common stock during the Class Period.

9.    In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

## II. JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to § 28 U.S.C. 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.    This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(1) because one or more of the Defendants may be found in this district. The Court also has personal jurisdiction over Defendants because the Company's principal executive offices are located in New York, New York. Defendants systematically and continuously have done and continue to do business in this State, and the case arises out of Defendants' acts within this State.

12.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plans in this district, some or all of the actionable conduct for which relief is sought occurred in this district, and one or more of the Defendants may be found in this district.

## III. PARTIES

**A.    Plaintiffs**

14.    Plaintiff Barbara Boland is a resident of New Jersey.  She is a participant or beneficiary of the SIP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and held shares of Company stock in her retirement account in the SIP, the RAP, and the Traditional ESOP during the Class Period.

15.    Plaintiff Anna Molin is a resident of New Jersey.  She is a participant or beneficiary of the SIP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and held shares of Company stock in her retirement account in the SIP, the RAP, and the Traditional ESOP during the Class Period.

**B.    Defendants**

16.    **Defendant Merrill Lynch.**  Merrill Lynch is a business entity organized under the laws of the state of Delaware with its executive offices located at 4 World Financial Center, New York, New York 10080.

17.    Merrill Lynch is a diversified global financial services company whose businesses provide wealth management, capital market and advisory services in 38 countries with approximately $1.8 trillion in client assets.

18.    As an investment bank, Merrill Lynch is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes.  This business is conducted within the Company's Global Management and Investment Banking Division ("GMI").  A sub-division of GMI, Fixed Income, Commodities and Currencies ("FICC"), underwrites and trades CDOs, which are pools of asset-backed securities.  In recent years, CDOs were frequently backed by subprime mortgage debt.

19.     **Director Defendants and Compensation Committee Defendants.**  As is explained in more detail below, the Company's Board of Directors and the Management Development and Compensation Committee ("Compensation Committee") both had certain responsibilities with respect to the Plans, including oversight responsibilities.

20.     Defendant E. Stanley O'Neal ("O'Neal") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period.

21.     Defendant Alberto Cribiore ("Cribiore") served as a member of the Company's Board of Directors and served as a member of the Compensation Committee during the Class Period.

22.     Defendant Armando M. Codina ("Codina") served as a member of the Company's Board of Directors and served as a member of the Compensation Committee during the relevant time period.

23.     Defendant Virgis W. Colbert ("Colbert") served as a member of the Company's Board of Directors and served as a member of the Compensation Committee during the relevant time period.

24.     Defendant John D. Finnegan ("Finnegan") served as a member of the Company's Board of Directors and served as a member of the Compensation Committee during the relevant time period.

25.     Defendant Aulana L. Peters ("Peters") served as a member of the Company's Board of Directors and served as a member of the Compensation Committee during the relevant time period.

26.     Defendant Carol T. Christ ("Christ") served as a member of the Board of Directors during the Class Period.

27.     Defendant Jill K. Conway ("Conway") served as a member of the Company's Board of Directors and served as a member of the Compensation Committee during the Class Period.

28.     Defendant Judith Mayhew Jonas ("Jonas") served as a member of the Board of Directors during the Class Period.

29.     Defendant David K. Newbigging ("Newbigging") served as a member of the Board of Directors during the Class Period.

30.     Defendant Joseph W. Prueher ("Prueher") served as a member of the Board of Directors during the Class Period.

31.     Defendant Ann N. Reese ("Reese") served as a member of the Board of Directors during the Class Period.

32.     Defendant Charles O. Rossotti ("Rossotti") served as a member of the Board of Directors during the Class Period.

33.     Defendants O'Neal, Christ, Cribiore, Codina, Colbert, Conway, Finnegan, Jonas, Newbigging, Peters, Prueher, Reese and Rossotti are hereinafter collectively referred to as the "Director Defendants."

34.     Defendants Cribiore, Codina, Colbert, Conway, Finnegan and Peters are hereinafter collectively referred to as the "Compensation Committee Defendants."

35.     **Senior Vice President, Leadership and Talent Management.**  As explained in more detail below, the Senior Vice President, Leadership and Talent Management had certain fiduciary responsibilities with respect to the Plans.

36.     On information and belief, **Defendant Peter Stingi** served as the Senior Vice President, Leadership and Talent Management during the Class Period.

7

37.    The identity of another person(s) who may have served as Senior Vice President, Leadership and Talent Management during the Class Period is currently unknown to Plaintiffs, and is therefore named fictitiously as John or Jane Doe 1. Once the identity of John or Jane Doe 1 is ascertained, Plaintiffs will seek leave to join him/her under his/her true name.

38.    Defendant Stingi and John and Jane Doe 1 are referred to as the "Senior Vice President, Leadership and Talent Management Defendant."

39.    **Senior Vice President, Human Resources.** As explained in more detail below, the Senior Vice President, Human Resources had certain fiduciary responsibilities with respect to the Plans, including appointment and oversight responsibilities.

40.    The identity of the Senior Vice President, Human Resources Defendant is currently unknown to Plaintiffs and is therefore named fictitiously as John or Jane Doe 2. Once the identity of this HR Defendant is ascertained, Plaintiffs will seek leave to join him/her under his/her true name.

41.    **The Plan Administrative Committee.** As explained more fully below, the Plans assigned certain fiduciary responsibilities and duties to the Administrative Committee. The Administrative Committee members have full authority and power to administer and construe the Plans. On information and belief, the individual Administrative Committee Defendants are as follows:

(a).    **Defendant Louis DiMaria** has served as a member of the Administrative Committee.

42.    The identities of the remaining members of the Administrative Committee are currently unknown to Plaintiffs and are therefore named fictitiously as John and Jane Does 3-10. Once the identities of additional Administrative Committee members are ascertained, Plaintiffs

will seek leave to join them under their true names. The Administrative Committee and its members (Defendant DiMaria and John and Jane Does 3-10) are referred to as the "Administrative Committee Defendants."

43.    **Plan Investment Committee**. As explained in more detail below, the Investment Committee Defendants have the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds. The identities of the Investment Committee Defendants are currently unknown to Plaintiffs and are therefore named fictitiously as John and Jane Does 11-20. Once the identities of the Investment Committee Defendants are ascertained, Plaintiffs will seek leave to join them under their true names. The Investment Committee Defendants (John and Jane Does 11-20) are referred to as the "Investment Committee Defendants."

## IV. THE PLANS

44.    The Plans, sponsored by Merrill Lynch, are "employee pension benefit plans," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are neither defendants nor plaintiffs. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

45.    The assets of an employee benefit plan, such as the Plans here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plans were held in trusts by Merrill Lynch Trust Company pursuant to the trust agreements. All contributions made to the Plans constitute a form of deferred compensation.

**A.    Merrill Lynch 401(k) Savings and Investment Plan.**

46.    The SIP became effective on October 1, 1987.  The purpose of the Plan is to encourage employees to save for retirement. *See* Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan, Annual Report (Form 11-K) at 4 (Dec. 31, 2006) (hereinafter the "2006 Form 11-K"); Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan, As restated, including amendments adopted through December 9, 2005 (hereinafter the "SIP Plan Document").

47.    Employees are eligible to participate in the SIP at commencement of their employment. 2006 Form 11-K.

48.    Individual notional accounts are maintained for each SIP participant. Participants' accounts are credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses. *Id.*

49.    Throughout the Class Period, participants in the SIP were permitted to defer a percentage of their base compensation for investment in the Plan.  SIP participants are allowed to contribute between 1% and 25% of their base compensation, up to an annual maximum of $15,000. *Id.*

50.    Prior to January 1, 2007, the Company matched 50% of the first 6% of a participant's contributions, up to an annual maximum Company contribution of $2,000, after one year of service.  Effective January 1, 2007, the Company matches 100% of the first 4% of a participant's contributions, up to a maximum of $3,000 annually for employees with eligible compensation of less than $300,000, after one year of service.  For employees with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution is $2,000. *Id.*

51.    Participants become fully vested in the Employer Contributions made to their Employer Contribution Subaccount upon the completion of five years of service.  SIP Plan Document § 4.1.3.

52.    Throughout the Class Period, the Plan fiduciaries, by and through the Investment Committee, selected the investment options (a.k.a. "Designated Investment Alternatives") that were made available to participants in the SIP for investment of their retirement savings.  The options consisted of various mutual funds, and, in addition, the Merrill Lynch Stock Fund.  2006 Form 11-K at 7; SIP Plan Document § 11.1.1.

53.    The Merrill Lynch Stock Fund was not a required feature of the SIP.  Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision made by the Plan fiduciaries, by and through the Investment Committee Defendants.  SIP Plan Document §§ 10.2.3(c) & 11.1.1.

54.    Nothing in the Plan limits the ability of the Plan fiduciaries to remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the option as prudence dictates.

**B.    Merrill Lynch Retirement Program.**

55.    All U.S. employees of Merrill Lynch are eligible to participate in the Retirement Program after completing one year of service.

56.    Participants in the Retirement Program become 100% vested in their accounts after three years of service.

57.    Once an employee is eligible for the Retirement Program two accounts are set-up: the RAP and the Traditional ESOP.  Contributions to a participant's RAP and Traditional ESOP

account are based, in part, on their years of service and their eligible compensation. The maximum annual eligible compensation used to determine contributions is set by the Internal Revenue Service ("IRS"). This amount is $225,000 in 2007. Contributions range from 2% to 8% depending on a participant's years of service. Participants may not contribute their own funds to these accounts.

     58.    The following is a summary of the steps taken by Merrill Lynch to determine if the Retirement Program contributions are made in the form of Company Stock and/or cash:

**Step 1: Annual Contributions**
Merrill Lynch looks at each participant's length of service as of each January 4 and his or her eligible compensation to determine the amount of annual contributions to each participant's Retirement Program accounts. Then, all of these contributions are added together to determine the total amount of annual contributions required.

**Step 2: Amount of Merrill Lynch Common Stock to Be Contributed**
Merrill Lynch determines the number of shares of Merrill Lynch common stock that will be contributed to participants' accounts for that year.

**Step 3: Market Value of Shares of Merrill Lynch Common Stock**
Merrill Lynch calculates the market value of the shares that will be contributed to participants' accounts (from Step Two). The market value of Merrill Lynch common stock is determined using the New York Stock Exchange closing price on the last business day of the year.

**Step 4: Determining the Percentage of Merrill Lynch Common Stock and/or Cash**
The market value of these shares is then divided by the total annual contribution amount (from Step One). The outcome of this calculation is a percentage – that percentage determines the split of cash and Merrill Lynch common stock that will be contributed to participants' accounts. For example, if the percentage is 7%, this means that 7% of that annual contribution will be made in Merrill Lynch common stock to ESOP accounts and 93% will be made in cash to RAP accounts.

*See* Retirement Chapter: Retirement Program Contributions.

1.    **RAP**

59.    The RAP became effective on January 1, 1989. The purpose of the Plan is to provide employees with a supplemental source of retirement income. *See* Merrill Lynch & Co., Inc. Retirement Accumulation Plan, As restated, including amendments adopted through December 9, 2005 (hereinafter the "RAP Plan Document").

60.    Merrill Lynch makes annual Retirement Contributions to the RAP utilizing the method described above. The Retirement Contributions to the RAP are in the form of Basic Credits. *Id.* at § 3.2. Basic Credits are varied based on a participant's years of service and are allocated in amount equal to a percentage of a participant's eligible compensation for the year in which they were a qualified participant. *Id.* For those who were participants in the RAP as of January 4, 1989, and met certain age requirements, the Company also makes Supplemental Credits and Additional Supplemental Credits to their accounts. *Id.* at § 3.3. The Company's contributions to the RAP are reduced by the value of Merrill Lynch shares allocated to the participant's Traditional ESOP account. *Id.* at § 3.5.

61.    In order for RAP participants to withdraw their Merrill Lynch stock held in their RAP accounts, participants must be vested and at least 59 ½ years old at the time of withdrawal if the ESOP shares in their RAP account were acquired as a result of Merrill Lynch contributions to the RAP and/or fund transfers to Merrill Lynch common stock. There are no withdrawal restrictions if the ESOP shares in their RAP account were transferred to the account from the Traditional ESOP. *Id.*

62.    Throughout the Class Period, the Plan fiduciaries, by and through the Investment Committee, selected the investment options that were made available to RAP participants for investment of their retirement savings. *Id.* §§ 5.1 & 8.3(c). The options consisted of various

mutual funds, and, in addition, the Merrill Lynch Stock Fund. Merrill Lynch 2006 Annual Report at 116.

63.    The Merrill Lynch Stock Fund was not a required feature of the RAP. Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision made by the Plan fiduciaries, by and through the Investment Committee Defendants. RAP Plan Document §§ 5.1 & 8.3(c).

64.    Nothing in the Plan limits the ability of the Plan fiduciaries to remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the option as prudence dictates.

65.    Indeed, the Investment Committee has the discretion, prior to or after investment in one or more investment alternatives, to invest "all or a portion of the Trust Fund" in "short-term securities issued on an interim basis or guaranteed by the United States of America or any agency or instrumentality thereof or any other prudent investments of a short-term nature that earn income." *Id.* § 5.1.

**2.    Traditional ESOP**

66.    The Traditional ESOP became effective on July 1, 1989.

67.    Merrill Lynch makes annual contributions to the Traditional ESOP as described above. Contributions to the Traditional ESOP are made in Merrill Lynch Common Stock. *See* Retirement Chapter: Retirement Program Contributions. On information and belief, participants do not exercise any authority or control over this investment decision.

68.    Upon completion of five years of service participants in the Traditional ESOP are able to diversify their account by: transferring their shares to their RAP account; rolling over to

an IRA or other tax-qualified retirement plan; transferring to a Merrill Lynch Brokerage Account; or by taking a cash distribution. *See* Retirement Chapter: ESOP Diversification.

**C.    ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties.**

69.    In addition to the designation of the Traditional ESOP as a purported ESOP, the portions of the SIP and the RAP that invested in Merrill Lynch Common Stock are also designated as purported ESOPs. SIP Plan Document § 1.40; RAP Plan Document § 1.34.

70.    An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). On information and belief, the SIP and the RAP did not satisfy all of the statutory and regulatory mandates with respect to ESOP design and/or operation. For example, the SIP and RAP are not designed to invest primarily in qualifying employer securities in violation of 29 C.F.R. § 2550.4073-6(b).

71.    Even if the portions of the SIP and the RAP designated as ESOPs satisfy all of the applicable regulatory requirements for this designation, just like 401(k) plan fiduciaries generally, fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

72.    Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the purported ESOP components of the SIP and RAP as well as for the Traditional ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

**D.    The Plans Incurred Significant Losses during the Class Period.**

73.    During the Class Period, Merrill Lynch Common Stock represented significant portions of the Plans' assets.

74.    As of December 31, 2006, the SIP held approximately 16.4 million shares of Merrill Lynch stock, then having a market value of approximately $1.5 billion, and representing 28% of the net assets of the Plan.  2006 Form 11-K at 11.

75.    As of December 31, 2005, the RAP held approximately 14 million shares of Merrill Lynch stock, then having a market value of approximately $948 million, and representing 40% of the net assets of the Plan.  RAP Form 5500 for year end Dec. 31, 2005 (available at http://www.freeerisa.com/5500/InstantView.asp?mainID=17317432).

76.    As of December 31, 2005, the ESOP held approximately 27 million shares of Merrill Lynch stock, then having a market value of approximately $1.76 billion, and representing 99% of the net assets of the Plan.  Traditional ESOP Form 5500 for year end Dec. 31, 2005 (available at http://www.freeerisa.com/5500/InstantView.asp?mainID=17317433).

77.    The Plans have incurred substantial losses as a result of the Plans' investment in Merrill Lynch stock.  Following revelations of the Company's serious mismanagement and improper business practices, including, among other practices: (a) rapidly expanding into a high-risk finance sector without establishing the requisite business skill set to manage and understand the corresponding risks; (b) persisting in its aggressive growth of the CDO business, despite clear indicators, including its own projections, weighing against continued growth; and (c) inflating the value of the Company's asset-backed portfolio by calculating their worth without regard to actual market conditions, Merrill Lynch stock has declined approximately 45 percent since the beginning of the Class Period.

## V.  DEFENDANTS' FIDUCIARY STATUS

**A.**    **The Nature of Fiduciary Status.**

78.    **Named Fiduciaries.**  Every ERISA plan must have one or more "named

fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).    The person named as the

"administrator" in the plan instrument is automatically a named fiduciary, and in the absence of

such a designation, the sponsor is the administrator.    ERISA § 3(16)(A), 29 U.S.C.

§ 1002(16)(A).

79.    **De Facto Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly

named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who

in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises

any discretionary authority or discretionary control respecting management of such plan or

exercises any authority or control respecting management or disposition of its assets, (ii) he

renders investment advice for a fee or other compensation, direct or indirect, with respect to any

moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he

has any discretionary authority or discretionary responsibility in the administration of such plan."

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

80.    Each of the Defendants was a fiduciary with respect to one or all of the Plans and

owed fiduciary duties to one or all of the Plans and the participants under ERISA in the manner

and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

81.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

§ 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the

interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

82.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

83.     Instead of delegating all fiduciary responsibility for the Plans to external service providers, on information and belief Merrill Lynch chose to assign the appointment and removal of fiduciaries to the monitoring Defendants named herein.  These persons and entities in turn selected Merrill Lynch employees, officers and agents to perform most fiduciary functions.

84.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.     Merrill Lynch's Fiduciary Status.**

85.     Pursuant to the SIP and RAP Plan Documents, the Company was the "Administrator" with respect to the SIP and the RAP, as those terms are defined in ERISA § 3(16)(A).  SIP Plan Document § 8.1.2; RAP Plan Document § 8.1.  Additionally, upon information and belief, the Company was also the "Administrator" with respect to the Traditional ESOP.

86.     Moreover, Merrill Lynch, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with

respect to the Plans, including the Investment Committee Defendants and Administrative Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. Merrill Lynch is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

87.    Finally, under basic tenants of corporate law, Merrill Lynch is imputed with the knowledge that the Defendants had regarding the misconduct alleged herein, even if not communicated to Merrill Lynch.

88.    Consequently, in light of the foregoing duties, responsibilities, and actions, Merrill Lynch was both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

89.    Merrill Lynch, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, on information and belief, Merrill Lynch relied and continues to rely directly on the Director Defendants, the Compensation Committee Defendants, and the other individual Defendants named herein to carry out its fiduciary responsibilities under the Plans and ERISA.

**C.    The Director Defendants Fiduciary Status.**

90.    Under Delaware law and Merrill Lynch's charter and bylaws, the Board had the authority to manage the business and affairs of Merrill Lynch. Because Merrill Lynch was, as

alleged above, a fiduciary of the Plans during the Class Period, so, necessarily, was the Board and its members, which had the ultimate authority for the affairs of Merrill Lynch.

91.     The Director Defendants are charged with the appointment, monitoring and removal of the Trustee and execution of the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plans.  SIP Plan Document at § 9.1.1; RAP Plan Document § 9.1.

92.     Moreover, upon information and belief, the Director Defendants are charged with the appointment of following Plan fiduciaries:  the Compensation Committee members; the Senior Vice President, Human Resources; and the Senior Vice President, Leadership and Talent Management.  Accordingly, the Director Defendants had the duty to monitor, and to remove, the Compensation Committee Defendants; the Senior Vice President, Human Resources Defendant; and the Senior Vice President, Leadership and Talent Management Defendant.  Thus, according to Department of Labor regulations, the Director Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

93.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**D.    Compensation Committee Defendants' Fiduciary Status.**

94.     According to the Compensation Committee Charter the Compensation Committee Defendants had various responsibilities, including the following duties with respect to the Plans:

The Committee shall review overall policy regarding compensation and benefit programs that are generally available to employees and make such recommendations as it deems appropriate with respect to such programs;

The Committee shall review and approve changes to benefit plans that result in the issuance of stock or in a material change to the benefits being provided to employees. For these purposes, material change shall mean any change that results in an expense or an expense reduction representing 10% or more of the Company's total employee benefit plan costs or fundamentally alters the nature of the benefits provided by the plan; and

The Committee shall exercise any duties and responsibilities that are delegated to the Board or a committee of the Board by any retirement or benefit plan documents and shall have the power to delegate such duties to an appropriate officer of the Company.

Compensation Committee Charter at V. 3.

95.    The Compensation Committee was to report to the Board of Merrill Lynch following meetings of the Compensation Committee. *Id.* at III. 3.

96.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**E.    Senior Vice President, Leadership and Talent Management's Fiduciary Status.**

97.    Pursuant to the SIP and the RAP Plan Documents, the Senior Vice President, Leadership and Talent Management had the authority "to amend the Plan to implement trading restrictions on Participant or Beneficiary transactions involving Designated Investment Alternatives" which would include the Merrill Lynch Stock Fund. Amendment to § 11.15 SIP Plan Document; Amendment to § 5.1 RAP Plan Document.

98.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Senior Vice President, Human Resources Defendant was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

F.    **Senior Vice President, Human Resources Defendant's Fiduciary Status.**

99.    Pursuant to the SIP and the RAP Plan Documents, and, upon information the Traditional ESOP Plan Document, the Administrative Committee Defendants and the Investment Committee Defendants were appointed by the Senior Vice President, Human Resources.  SIP Plan Document § 10.1.1 and § 10.2.1; RAP Plan Document § 8.2 and § 8.3.  Accordingly, the Senior Vice President, Human Resources had the duty to monitor, and to remove, the members Administrative Committee and the Investment Committee.  Thus, according to Department of Labor regulations, the Senior Vice President, Human Resources Defendant exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

100.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Senior Vice President, Human Resources Defendant was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

### G.    Administrative Committee Defendants' Fiduciary Status.

101.    According to the Plan Documents for the SIP and the RAP, and, upon information and belief, for the Traditional ESOP, the Administrative Committee is the "named fiduciary" of the Plans, as that term is defined under ERISA, with authority to manage and control the operation and administration of the Plans.  SIP Plan Document § 8.1.1; RAP Plan Document § 8.1.

102.    Pursuant to the plan instruments, the Administrative Committee had the "exclusive authority and right to interpret the Plan provisions and to exercise discretion where necessary or appropriate in the interpretation and administration of the Plan and to decide any and all matters arising thereunder or in connection with the administration of the Plan...".  SIP Plan Document § 10.1.3; RAP Plan Document § 8.2.  At all relevant times, the "decisions, actions and records of the Administrative Committee [are] conclusive and binding....".  SIP Plan Document § 10.1.3; RAP Plan Document § 8.2.

103.    In addition, the Administrative Committee has the following powers and duties:

(a).    The Administrative Committee shall have the power to promulgate such rules and procedures, to maintain or cause to be maintained such records and to issue such forms as it shall deem necessary or desirable for the administration of the Plan.

(b).    Subject to the terms of the Plan and applicable law, the Administrative Committee shall determine the time and manner in which all elections authorized by the Plan shall be made or revoked.

(c).    The Administrative Committee may direct that such amounts be withheld from any payment due under this Plan as required to comply with applicable income tax law.

(d).    The Administrative Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e).    The Administrative Committee shall exercise all of its powers and responsibilities in a nondiscriminatory manner.

23

(f).    The Administrative Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Administrative Committee and shall not be liable for any act or omission of a person so designated.

SIP Plan Document § 10.1.3.

104.    On information and belief, in order to comply with ERISA, the Administrative Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA. *See e.g.,* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).    In this regard, on behalf of the Company, the Administrative Committee disseminated the Plan documents and related materials which, among other things, incorporated by reference Merrill Lynch's misleading Securities & Exchange Commission ("SEC") filings, thus converting such materials into fiduciary communications.

105.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Administrative Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**H.    Investment Committee Defendants' Fiduciary Status.**

106.    According to the Plan Documents for the SIP and the RAP, and, upon information and belief, for the Traditional ESOP, the Investment Committee is the "named fiduciary" of the

Plans for investment purposes as that term is defined under ERISA.  SIP Plan Document § 8.1.1;

RAP Plan Document § 8.1.

107.    In addition, the Investment Committee has the following powers and duties:

(a).    The Investment Committee shall establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA.

(b).    The Investment Committee shall have the power to direct the assets of the Trust be held in a master trust consisting of assets of qualified plans maintained by the Company or an Affiliate.

(c).    The Investment Committee shall have the authority to establish Designated Investment Alternatives and permit the investment of Accounts in Company Stock....

(d).    The Investment Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e).    The Investment Committee shall exercise all of its powers and responsibilities in a nondiscriminatory manner.

(f).    The Investment Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Investment Committee and shall not be liable for any act or omission of a person so designated.

SIP Plan Document § 10.2.3; RAP Plan Document § 8.3.

108.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## VI. FACTS BEARING ON FIDUCIARY BREACH

A.    **Merrill Lynch Stock Was an Imprudent Investment for the Plans during the Class Period Because of the Company's Serious Mismanagement, Insufficient Risk Management, and Precipitous Decline in the Price of its Stock**

    1.    **Background.**

        a.    **The Rise of Subprime Mortgage Lending.**

109.    Due to a confluence of factors, the residential mortgage market grew at a rapid pace over the past several years.

110.    One of the products of this new mortgage market is phenomenal growth in subprime lending.  The term " subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."  Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd., *Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services*, U.S. House of Representatives:  Subprime Mortgages.  Mar. 27, 2007, *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070327/default.htm.

111.    Between 2004 and 2005, the subprime mortgage lending industry grew from $120 billion to $625 billion.  Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

112.    At the end of 2006, subprime borrowers represented approximately 13-14% of the 43 million first-lien mortgage loans outstanding in the United States.  Subprime lending has

grown rapidly in recent years. In 1994, fewer than 5% of mortgage originations were subprime, but by 2005 about 20% of new mortgage loans were subprime.

113.    Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors. *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony Before the Committee on Mortgage Market Turmoil: Causes and Consequences*, Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/spmar22071.html.

114.    In 2004, as interest rates began to climb, the pool of potential prime borrowers looking to refinance began to dry up and lenders began extending loans to subprime borrowers with troubled credit histories in an effort to maintain or grow market share in a declining origination environment. Thus, between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.

115.    In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans, allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load, introducing new products designed to lower borrowers' monthly payments for an initial period and allowing borrowers to take out loans with little, if any, documentation of income and assets. *See* Ruth Simon, *Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

116.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers which put them at greater risk of defaulting.

117.    In late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices were increasing risks for borrowers and lenders in overheated housing markets. *See* Simon, *Mortgage Lenders, supra.*  As lenders were making it easier for borrowers to quality for loans by such practices as described above, they were also greatly increasing the likelihood that borrowers would be unable to make payments, and that defaults would rise.

118.    Of particular concern was the prevalence of adjustable-rate loans, which in combination with the lowered lending standards, were more likely to result in borrowers' early payment defaults.

119.    In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well. *Id.*; Testimony of Sandra L. Thompson, *supra.*  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.

120.    However, most subprime lenders failed to heed these and other warnings. Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards. Many lenders kept introductory "teaser" rates low even after short-term interest rates began rising in June 2005. It was not until mid to late 2006 when lenders began to tighten up their terms.

121.    Thus, in mid-2005, delinquency rates for subprime loans (60-days or more past due) rose for the first time since 2002.  By the fourth quarter of 2005, delinquencies and foreclosures began to rise even more severely – as of October 2005, the delinquency rate was three times that recorded on new subprime loans a year earlier.  *See* Simon & Hagerty, *More Borrowers, supra.*

122.    According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period.  Testimony of Sandra L. Thompson, *supra.*

**2.    Merrill Lynch and the CDO Market.**

123.    A CDO is a *security* backed by a pool of assets, often mortgage-backed assets. Once a mortgage loan is originated, it is packaged into a security.  These are then sliced into different tranches, based upon risk and interest yield, and sold to investors.  Because of the high yields associated with subprime mortgages, these mortgages became very attractive for investment banks packaging CDOs.

124.    In 2003, Merrill Lynch began to invest in CDOs and other mortgage-backed securities, as described below:

> From 2003 to early 2006, Christopher Ricciardi helped transform Merrill from bit player to powerhouse in the lucrative business of bundling loans into salable securities. But the value of many of the securities, known as collateralized debt obligations, or CDOs, has tanked this summer and fall amid rising mortgage delinquencies.
>
> ***
>
> Along the way, [Ricciardi] lobbied both credit-rating firms and investors, talking up the safety and juicy returns of CDOs. He and his former Merrill colleagues churned these out frenetically during the height of the boom. Now that the market has soured, leading to billions of dollars in losses for CDO investors, those involved in the business face a growing legion of angry investors.

\*\*\*

Mr. Ricciardi's role is emblematic of the drive that so often pushes Wall Street to extremes. Long after signs of housing troubles first emerged in mid-2005, he and his colleagues at Merrill were setting out to smash records by issuing ever more CDOs.

From the manicured lawns at the exclusive Sleepy Hollow Country Club to the ski slopes of Jackson Hole, Wyo., and wood-paneled rooms of Manhattan's Harvard Club, they courted investors with promises of well-managed risk and outsize returns. They helped to build a small army of a new sort of finance professional, people who manage the mountain of complex debt instruments being created..

\*\*\*

The bundling of loans into salable securities was already a common business, but a much simpler one. Fannie Mae and Freddie Mac, the big government-sponsored mortgage buyers, had long been doing this with ordinary home loans. But as the government began to auction off huge collections of assets from failed S&Ls, Wall Street experimented with more exotic methods.

It bundled together pools of assets containing loans of many different types, ranging from credit-card debt to volatile aircraft leases. With these pools as backing, bankers issued new securities that had varying levels, or tranches, of risk and interest yield. Mr. Ricciardi was among pioneers who took this laboratory of debt repackaging a step further: Bundling the already exotic tranches together into new pools called CDOs.

All of these securities had high-risk tranches, the slices that would bear the brunt of any loan defaults. These often had low credit ratings and were hard to sell, despite their potentially high returns.

Mr. Ricciardi went an additional step in the business of bundling and rebundling, and created new CDOs out of these risky tranches. And the natural structure of a CDO -- whereby the impact of defaults falls first on the riskiest tranches -- made it possible for the safest tranches of even these CDOs to get top credit ratings.

\*\*\*

[Merrill's] top brass was determined to get bigger in this growing business. Contacted by a headhunter, Mr. Ricciardi jumped to Merrill in 2003.

Merrill was in transition those days. It had a new CEO, Mr. O'Neal, who was trying to turn the firm into a nimble presence that darted in and out of lucrative,

fast-growing businesses. His priorities included debt financing and derivatives, or instruments whose value depends on a change in some other asset's value. Merrill, Mr. Ricciardi told BondWeek magazine in January 2004, "had a good foundation for a good CDO business." What it needed was a "jump start."

\*\*\*

Merrill leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.22 billion of deals, to the No. 1 spot on Wall Street in 2004 with $19 billion, according to Dealogic. In 2005 Merrill's underwriting total soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages.

Within Merrill, Mr. Ricciardi drew attention at the highest levels. His group became an increasingly important profit center for Merrill, which reaped an estimated $400 million in CDO underwriting profits in 2005.

\*\*\*

Before he left Merrill, Mr. Ricciardi had budgeted for no growth in 2006 in mortgage CDOs at the firm. But following the departures, Dow Kim, then head of markets and investment banking at Merrill, sought to reassure the CDO group that Merrill remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs, say three people who heard him.

\*\*\*

That year [2006], Merrill sharply boosted subprime-CDO issuance to $44 billion, from $14 billion in 2005. Its fees from CDOs jumped to more than $700 million. Well into 2007, Merrill continued to ramp up deals.

Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move into CDOs*, Wall St. J., Oct. 25, 2007.

125.    Even as signs emerged that the subprime market was softening, Merrill Lynch continued building its subprime pipeline even in December 2006, when it purchased subprime lender First Franklin Mortgage Corporation for $1.3 billion.

**B.    Defendants Touted Merrill Lynch's Financial Health, Despite Knowledge of Merrill Lynch's Stock Risk.**

126.    Because of Defendants' positions within the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

127.    Because of the access to this information, the Defendants knew or should have known that Merrill Lynch's common stock was an imprudent investment during the Class Period.

128.    Despite the Defendants' knowledge of Merrill Lynch's risky business practices during the Class Period, the Company fostered a positive attitude toward Merrill Lynch as a Plan investment. Management touted strong Company performance and stock benefits. Employees were continually told positive news by Company executives about Merrill Lynch's growth, and were led to believe that Merrill Lynch stock was a good investment, and that the Plan was prudently managed.

129.    Moreover, Merrill Lynch publicly and repeatedly highlighted favorable operating results, artificial favorable revenue growth trends, and other positive financial indicators, which were later found to be misleading, including the following:

130.    On January 18, 2007, the Company reported its financial results for fourth quarter and full year 2006 in a release that stated, in part:

"We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer. "By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent. We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

Fourth quarter 2006 net earnings were $2.3 billion, and net earnings per diluted share were $2.41, up 71% from the year-ago quarter but down 24% from the third quarter of 2006, which included the one-time net gain from closing the BlackRock transaction. Similarly, pre-tax earnings of $3.4 billion were up 65% from the year-ago period but down 19% from the third quarter, as net revenues of $8.6 billion were up 27% from the year-ago quarter and down 13% sequentially. The fourth quarter pre-tax profit margin was 39.0%, and the annualized return on common equity was 25.6%.

Excluding the one-time merger-related net benefits in the third quarter of 2006 from the sequential comparisons, Merrill Lynch's fourth quarter 2006 net earnings and diluted earnings per share were both 21% higher than the third quarter; pre-tax earnings were 42% higher; net revenues were 8% higher; and all those fourth quarter results would have set quarterly records.

131.    During the Fourth Quarter 2006 Earnings Call on January 18, 2007, Jeffrey N. Edwards, Senior Vice-President and Chief Financial Officer stated:

[O]ur Investment Banking business continued to make great strides ranking number one for the quarter in global equity and equity linked underwriting league tables and number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space. For the year we also ranked in the top five in global high yield origination for the first time since 1998, and this is the first year since 2003 that any non-commercial bank player has cracked the top five in this crucially important product category.

132.    On February 26, 2007 the Company filed its annual Form 10-K for the fiscal year 2006, which included fourth quarter and full year 2006 results ("2006 10-K"). In the report, the

Company stated results for its Global Market and Investment Banking Division (GMI), and,

within GMI, its Fixed Income, Currencies and Commodities (FICC) division, as follows:

> During 2006, our GMI [Global Market and Investment Banking] business
> generated record-setting financial performance by continuing to serve clients well,
> take measured principal risk and execute on a variety of key growth initiatives
> around the world. Every major GMI business produced revenue growth over 2005
> against a market backdrop that was favorable for most of the year. Across all
> businesses, GMI had a net increase of more than 200 managing directors and
> directors and 280 vice presidents to its headcount.

> In FICC, we continued to broaden the scope of the commodities trading business
> in terms of product, geography, and linkage to the broader client franchise,
> including trading in oil and metals and geographically in the Pacific Rim. We also
> enhanced our structured finance business with three strategic transactions in the
> U.S., United Kingdom and South Korea that we expect to provide additional
> sources of origination and servicing for our non-prime mortgage-backed
> securitization and trading platform. We also made progress in key investment
> areas including both interest rate and credit derivatives, principal investing/real
> estate, and foreign exchange

> Within FICC, on September 5, 2006, we announced an agreement to acquire the
> First Franklin mortgage origination franchise and related servicing platform from
> National City Corporation. We expect First Franklin to accelerate our vertical
> integration in mortgages, adding scale to our mortgage securitization and trading
> platform. This acquisition was completed on December 30, 2006, the first day of
> our 2007 fiscal year.

133.    On April 19, 2007 Merrill Lynch issued its first quarter 2007 financial results, in

which the Company stated:

> Merrill Lynch (NYSE: MER) today reported strong growth in net earnings and
> earnings per diluted share for the first quarter of 2007, driven by net revenues of
> $9.9 billion. Net revenues were up 24% from the prior-year period and up 14%
> from the fourth quarter of 2006, with increases both year-over-year and
> sequentially in both Global Markets and Investment Banking (GMI) and Global
> Wealth Management (GWM), and in all global regions. These are the second-
> highest quarterly net revenues Merrill Lynch has ever generated, only $51 million
> lower than in the third quarter of 2006, when net revenues included a $2.0 billion
> one-time, pre-tax gain arising from the merger of Merrill Lynch Investment
> Managers (MLIM) with BlackRock, Inc. (NYSE: BLK).

First quarter 2007 net earnings per diluted share were $2.26, up 414% from $0.44 for the first quarter of 2006, or 37% on an operating basis which excludes $1.2 billion, after taxes, of one-time compensation expenses from the 2006 first quarter. Net earnings per diluted share were down 6% from $2.41 for the fourth quarter of 2006.First quarter 2007 net earnings were $2.2 billion, up 354% from the first quarter of 2006, or up 31% excluding the one-time expenses in the prior-year period. Net earnings were down 8% from the fourth quarter of 2006, which included a lower compensation expense ratio. The pre-tax profit margin for the first quarter of 2007 was 31.4%, and the annualized return on average common equity was 23.3%. At the end of the first quarter, book value per share was $41.95, up 13% from the end of the first quarter of 2006 and 1% from the end of 2006.

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chief executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

GMI generated record revenues, both overall and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S. revenues, which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

GMI's first quarter 2007 net revenues were a record $6.5 billion, up 43% from the year-ago quarter. Compared with the first quarter of 2006, net revenues increased in all three major business lines:

Fixed Income, Currencies and Commodities (FICC) net revenues increased 36% to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels. Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters.

134.    In a First Quarter conference call with analysts on April 19, 2007, Jeffrey

Edwards stated:

> I want to pause here to make a few comments about our U.S. subprime mortgage
> business, since I know it has been a topic of much discussion and speculation. Let
> me put this business into context. As we noted in our earnings release, if you
> looked at both last year and the first quarter of this year and added up all of the
> origination, securitization, warehouse lending, trading and servicing revenues,
> both directly in our subprime business as well as      our CDO activity involving
> subprime, including all the retained interests, you would see that revenues from
> subprime mortgage-related activities comprise less than 1% of our net revenues
> for those five quarters. And even if you were to incorporate, pro forma, the
> revenues of First Franklin as if they were a part of our firm for all of 2006, the
> aggregate contribution would still be less than 2%.
>
> That said, this is an asset class that will continue to be significant, both in the U.S.
> and worldwide. And the strategic importance of the First Franklin acquisition was
> clearly evident this quarter, as having both origination and servicing capabilities
> enabled us to see trends emerge sooner and adjust underwriting standards and
> pricing more rapidly.
>
> I would also point out that our risk management capabilities are better than ever,
> and crucial to our success in navigating turbulent markets. In fact, we've been
> capitalizing on the market dislocation by recruiting the best talent from
> competitors, and we fully expect to emerge from this cyclical downturn even
> better positioned.
>
> At this point, we believe the issues in this narrow slice of the market remain
> contained and have not negatively impacted other sectors. Finally, it's important
> to understand that we manage our FICC businesses in aggregate as a portfolio and
> that portfolio delivered record revenues for the quarter. On a broader basis, most
> FICC markets experienced a continued favorable environment characterized by
> both high levels of client activity and opportunities for proprietary trading,
> enabling outstanding results as we continue to build out our capabilities in areas
> that are poised for growth.

135.    During this April 19, 2007 call Investment Analyst William Tanona of Goldman

Sachs asked Edwards:

> **Q - William Tanona**: ...And then, your commentary there in terms of sharing
> risk, obviously I think there is a lot of concern out there because you guys are
> pretty active on the CDO side and the warehouse side of that business. Can you

share your thought process as it relates to that and what the trends you are seeing there in the overall business, as well as possibly even in the subprime space there?

**A - Jeffrey Edwards**: Well, it was a very active quarter for securitizations, both in the ABS space directly and in the CDO space broadly. In CDOs, in addition to having a very active ABS calendar, we saw the tension in that business broadening out to other asset classes as well. But I would point out that even during the most uncertain times during the quarter, we were able to price transactions. We priced 28 CDO transactions in the quarter, 19 of them were ABS CDOs and more than 10 of those deals were in the first couple of weeks of March, so while it was certainly a more difficult environment, we continued to see an ability to transact and to move volume. And on the subprime business, maybe just a couple of more comments there.

While it was a difficult environment, we were able to actually increase origination volumes at First Franklin in the quarter. And in fact, we had record volumes in both January and February. And we did that in a background where we were enhancing our already strong underwriting standards. We rationalized our array of products, eliminating certain products that were performing less well, and we successfully raised coupon rates. And we also saw during the quarter the first payment defaults at First Franklin, of First Franklin-originated paper fall steadily throughout the quarter. They started out and remain at a level far below the industry.

So I think the trends there show some signs of positiveness, and while it is early to say anything obviously about the second quarter, I'd just point out that we did our First Franklin securitization earlier in the week. It was a $2 billion securitization and we saw spreads tighter really across all tranches from where they were a month ago, as investors have clearly begun to reengage.

136.    In mid-July, before the credit crunch worsened, Merrill Lynch reported better-than-expected earnings with little impact from exposure to mortgage-backed securities. Asked about the firm's mortgage position on a call with analysts, Merrill Lynch Chief Financial Officer Jeffrey Edwards said: "Proactive aggressive risk management has put us in an exceptionally good position." Two weeks later, Defendant O'Neal personally sent an email to Merrill Lynch employees assuring them the firm had such risks well in hand. However, as reported in *The Wall Street Journal* on October 12, 2007:

By the end of June 2007, Merrill had CDO exposure of $32.1 billion and a subprime-mortgage exposure of $8.8 billion, totaling $40.9 billion. Much of the CDO exposure was in triple-A rated "super senior" slices. These were supposed to enjoy strong protection against defaults, but they began to decline steeply in price in late July.

137.    On July 17, 2007, Merrill Lynch reported earnings for the second quarter of 2007, announcing the following:

> Merrill Lynch (NYSE: MER) today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.
>
> Second quarter 2007 total net revenues of $9.7 billion increased 19% from $8.2 billion in the prior-year period and were down 1% from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets and Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second-highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pre-tax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.
>
> "We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline, and global expansion continues to enhance the earnings power of our franchise."
>
> ***
>
> Fixed Income, Currencies and Commodities (FICC) net revenues increased 55% to $2.6 billion, driven primarily by strong growth in net revenues from trading credit products, interest rate products and commodities, partially offset by a decline in net revenues from the structured finance and investments business, which includes mortgage-related activities. For the first six months of 2007, FICC generated a record $5.4 billion in net revenues, up 45% from 2006, reflecting increased diversity and depth across asset classes.

138.    In the July 17, 2007 Earnings Conference Call, Jeffrey Edwards answered questions from UBS Investment Analyst Glenn Schorr and Deutsche Bank's Mike Mayo and

reassured investors and the market that the Company was prepared to weather the volatile CDO market:

> **Q - Glenn Schorr**: ... Can we switch to the other one that you brought up, in terms of both subprime and CDO exposure? You are one of the largest – or the largest – underwriter of CDOs, and maybe try to give some color around myth versus reality in how people should think about a) what's on your books in terms of residuals and exposure, and b) maybe even comment on related to some of the Bear hedge funds what collateral you have taken on your books or have not. And just overall comfort there, as well.

> **A - Jeffrey Edwards**: Okay. Well, look, again I want to make two points. The first is that this is another example where I think proactive, aggressive risk management has put us in exceptionally good position. Obviously the market has gone through a period of flux. We think that remains the case. But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We've seen significant reductions in our exposure to lower-rated segments of the market. Our warehouse lines are down materially, our whole-loan inventory is down materially. As was the case in the last quarter, we will see a modest increase in our residual position, but it will be small relative to our overall retained interest piece. And I think the majority of our exposure continues to be now in the highest credit segment of the market. ...

> **Q - Glenn Schorr**: Maybe just a last thing, yes or no – obviously, yes – but point of clarification, therefore anything you're financing in your repo business or through your prime brokerage business or on your own books, you've, to the best of your knowledge at the end of quarter is marked to an effective market even if it is a mark to model type of security?

> **A - Jeffrey Edwards**: Yeah, that's right. I mean, obviously we have a very robust process around marking these assets, and we're confident in how they were marked, how they'll mark.

* * *

> **Q - Mike Mayo**: ...Can you remind us what percent of your earnings are related to mortgage or subprime mortgage, and if you could include in that CDOs and warehouse lines or anything else?

> **A - Jeffrey Edwards**: Well, just to remind everybody, we made the comment in the first quarter that over the previous five quarters, all of that activity as broadly as we could define it, represented less than 2%. As I said, the business overall was down compared to last year, it was up compared to the first quarter. I don't think there's anything that would change that comment that I made in the first quarter.

**Q - Mike Mayo:** Then lastly, a tougher question perhaps, how much of your capital is at risk or how much in total assets do you have that's somehow related to that same category?

**A - Jeffrey Edwards:** Well, we obviously have a robust economic capital model that we employ to address risk around all of our different assets. From an overall asset standpoint, again the point I would make there is that there's been, we think, an important transformation of the components of that asset base where the exposure that we retain is in the higher-rated tranches of the exposure, and what we've done is reduce exposure in some of the broader or lower-rated categories.

**Q - Mike Mayo:** Okay. Do you have an overall number, though, for how much capital you have at risk related to subprime mortgage, CDOs, warehouse lines?

**A - Jeffrey Edwards:** We don't disclose our capital allocations against any specific or even broader group.

139.    The Company was overleveraged in subprime market investments, including CDOs and other mortgage-backed securities.   As discussed above, Merrill Lynch became the largest underwriter of CDOs in the past few years, underwriting $14 billion in subprime mortgage securities in 2005, and increasing that figure to a staggering $44 million in 2006.  The Company did this despite the obvious signs that the subprime market was deteriorating.  When the subprime market collapsed, the Company found itself exposed to billions in losses from securities that could no longer be sold because of their obvious risk and plummeting value.

140.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plans' participants.  Defendants knew or should have known that the Company's stock price would drop drastically and that Plans' participants would lose billions, once the truth was exposed.

141.    Instead, during the Class Period, Defendants continually touted the Company and its stock.

C.    **Merrill Lynch's Belated Disclosure Causes its Stock Price to Plummet.**

142.    On October 3, 2007, Merrill Lynch ousted Semerci, the most recent overseer of Merrill Lynch's accumulation of CDOs.  The next day, *Bloomberg News* reported that Merrill Lynch had abandoned its plans to do business with the hedge fund managed by its former executive Dow Kim.  *Bloomberg News* also reported that: "The company severed ties instead because Kim had been responsible for the mortgage and fixed-income businesses that are now causing losses."  Bradley Keoun, *Merrill Severs Ties With Former Executive Kim's Fund*, Bloomberg News, Oct. 4, 2007.

143.    Unfortunately, the damage to its business had already been done.  On October 5, 2007, Merrill Lynch announced that it would take an estimated $4.5 billion loss on CDOs and related to the Company's subprime exposure.  Defendant O'Neal, who earlier dismissed credit market concerns in a July 2007 memo to employees, addressed Merrill Lynch employees via video and "took pains to pinpoint the date that the credit crunch worsened as the day in early August when European central banks first stepped in to provide liquidity to the banking system, indicating how much conditions had deteriorated."  Smith, *Merrill Loss May Be Wider Than Projected, Supra.*

144.    Despite Defendant O'Neal's protestations, the grave risk was previously known and ignored.  As alleged above, analysts had previously pointed out the risk of subprime exposure in September 2006 and April 2007.  According to the *New York Times*, Merrill Lynch's Board of Directors had been informed of its subprime exposure and CDO obligations in July 2007. *Id.*  Despite the Company's vast exposure to CDOs and subprime, the Board failed to take any action to decrease the risks faced by the Company and the Plans.

145.    "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls." Or, as stated by one corporate and securities law professor "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective. It turns out, they weren't." Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

146.    As summarized by Brian Foley, an executive compensation expert, the Merrill Lynch situation "looks like a systemic problem in terms of risk management and risk control – the whole nine yards…. There seems to be some blame to go around." *Id.*

147.    Defendant O'Neal shares this assessment. On October 25, 2007, Merrill Lynch shocked the market by taking a massive write-down of $7.9 billion. During a conference call announcing the results, Defendant O'Neal commented:

> Over the past few weeks, our FICC management team, led by David, has worked with out Finance staff to undertake a rigorous and comprehensive review of our remaining CDO and subprime related exposures. This collective review has resulted in the use of more conservative valuation assumptions, and a total net write-down of approximately $7.9 billion for this quarter.
>
> ***
>
> The bottom line is that we got it wrong by being over-exposed to subprime and we suffered as a result of an unprecedented liquidity squeeze and deterioration in that market. No one, no one, is more disappointed than I am in the result.
>
> ***
>
> Despite the fact that nearly all of our remaining CDO exposure is super senior, it turned out that both our assessment of the potential risk and our mitigation strategies were inadequate

***

> We're not, I'm not, going to talk around the fact that there were some mistakes that were made. We, I am accountable for these mistakes, just as I am accountable for the performance of the firm overall. And my job, our job, the leadership team's job – is to address where we went wrong and what changes were necessary, to make sure that we respond to changes in risk dynamics early, correctly, and in every asset class at every stage of the market's evolution.

***

> So, as I have mentioned, we have made a number of important changes....

*Merrill Lynch Third Quarter 2007 Earnings Conference Call*, Oct. 24, 2007 (available at http://files.shareholder.com/downloads/MER/197622170x0x139158/ea4f7956-7c53-4e86-86a4-f8f17f023245/blank.pdf).

148.    During the conference call, Defendant O'Neal reiterated the Company's failure to manage its risk and warned that additional write-downs were a possibility. *Id.*

149.    Despite the magnitude of the announcement, both Defendant O'Neal and Merrill Lynch's Chief Financial Officer, Edwards, refused to provide complete, straight-forward information regarding the Company's disposition of its inventory of CDOs. Analysts questioned the executives about the $11 billion chunk of CDO left unaccounted for by the write-down from $32 billion to $15 billion. Defendant O'Neal repeatedly refused to comment. A Lehman Brothers analyst asked whether the existing CDO exposures are held in broker / dealer accounts or on the Company's balance sheet. Edwards reportedly declined to answer the question, saying "we've provided an extraordinarily high level of disclosure, which should be sufficient." *Id.*

150.    During the analyst call, Standard & Poor's announced that it had downgraded Merrill Lynch's debt to A+ from AA-. Merrill Lynch shares fell 5.7%, causing further significant losses to the Plans.

151.    Neither Defendant O'Neal nor Edwards could explain why the Company's write-down of asset values – based on a fixed date in time – had nearly-doubled in only three weeks. In fact, Defendant O'Neal flip-flopped during the call, at one point acknowledging "the amount we're now indicating is one that was within the range of valuations we did at the time." If that statement is true, it is reasonable to infer that the Company realized the massive write-down amount on October 4, 2007, but attempted to mitigate the information's impact on the market by releasing the bad news in increments.

152.    The Company's stock continued to drop over the next days, as rumors swirled regarding Defendant O'Neal's future at the Company and analysts downgraded the Company's stock. News articles chronicled the FICC business' recent personnel changes and documented the risky practices implemented by young bankers who collected tens of millions of dollars in bonuses and fled the Company before its actual financial condition came to light.

153.    On October 30, 2007, Merrill Lynch announced that Defendant O'Neal had retired, effective immediately. That day, the Company's stock closed at $65.56 per share, down from a closing price of $76.00 on October 3, 2007, the day before the Company began publicly discussing its subprime losses.

154.    Even after the $7.9 billion write-down, analysts questioned how Merrill Lynch had reduced its exposure – through hedging or selling CDO inventory – and the financial press reported that the SEC was investigating reports that Merrill Lynch had engaged in transactions with hedge funds designed to delay reporting its exposure to risky mortgage-backed securities.

155.    The Company immediately denied that it had entered into such transactions. On the same day *The Wall Street Journal* article appeared, the Company issued a press release:

159.    Analysts continue to speculate that the Company has not come clean regarding the full extent of its past shenanigans and its exposure to subprime-backed securities and CDOs. Some analysts are predicting that the Company faces up to an additional $10 billion in write-downs. Evelyn Rusli, *Morgan Stanley: It Could've Been Worse*, Forbes, Nov. 8, 2007. Mike Mayo, an analyst at Deutsche Bank, aptly summed up the situation: "We have increasingly lost confidence in the financials of Merrill. It's not enough to say the CEO has gone, problem fixed." Bowley and Anderson, *Where Did the Buck Stop at Merrill?, supra*. The SEC investigation and the possibility of enforcement action against Merrill Lynch raises even further the unacceptable level of risk faced by Plan participants as a result of the Plans' enormous investment in Merrill Lynch stock.

**D.    Defendants Knew or Should Have Known That Merrill Stock Was an Imprudent Investment.**

160.    Given the factors described above, it is clear that since the beginning of the Class Period, Merrill Lynch was engaged in a perilous business strategy, was being seriously mismanaged and faced dire risk due to its subprime and CDO exposure. Ignoring these problems, and indeed, attempting to conceal them with false and misleading statements which caused the price of Merrill Lynch stock to be artificially inflated, exacerbated the problems. In the end, when the severity of the circumstances came to light, the Plans suffered staggering losses, all or some which could have been avoided had the Plans' fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA.

161.    At all relevant times, Defendants knew or should have known that Merrill Lynch stock was an imprudent investment for the Plans due to the numerous operational problems and risk management deficiencies described above. Defendants disregarded sound business practices

46

and failed to implement risk-management processes despite the numerous warnings from industry observers and regulators regarding the risks of subprime markets and looming trouble in credit markets. Merrill Lynch reportedly also engaged in improper transactions that artificially inflated the price of Company stock and were designed to hide the Company's true financial condition.

162.    Accordingly, it was imprudent for the Plans' fiduciaries to continue offering Merrill Lynch stock as a Plan investment option, holding Merrill Lynch stock in the Plans, and/or making new investment in Company stock during the Class Period. Merrill Lynch stock was an imprudent investment for the Plans as it posed an inordinate risk of significant loss, and this risk is not one that should have by the participants and beneficiaries of the Plans. The Plan fiduciaries disregarded the Company's deteriorating financial circumstances when it came to managing the Plans' investment in Merrill Lynch stock, and were unwilling or unable to act prudently to rescue the Plans' investments. Under the circumstances, the continued investment of billions of dollars of participants' retirement savings in Merrill Lynch stock was reckless and imprudent, and contrary to the best interests of the Plans' participants and beneficiaries.

163.    Despite these facts, Defendants took no meaningful action to protect the heavily Merrill Lynch-invested Plans and their participants from the significant losses that they have incurred.

164.    During the Class Period prudent fiduciaries of the Plans would not have ignored the circumstances and allowed the risk of loss to the Plans' participants and beneficiaries to increase to unacceptable levels. Unfortunately, the Defendants did exactly that and for all intents and purposes wiped out a significant portion of the Plans' assets.

165.    As Directors of the Company, the Director Defendants and the Compensation Committee Defendants knew or should have known of the existence of the above-mentioned problems.

166.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the Company's true financial condition, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Merrill Lynch stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

167.    Defendants failed to conduct an appropriate investigation into whether Merrill Lynch stock was a prudent investment for the Plans and failed to provide the Plans' participants with information regarding Merrill Lynch's risky business plan so that participants could make informed decisions regarding their investments in Company stock in the Plans.

168.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Merrill Lynch stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

169.    Because Defendants knew or should have known that Merrill Lynch stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and its participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Company stock.

170.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of Company

stock; discontinuing further contributions to and/or investment in Merrill Lynch stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants and beneficiaries of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Merrill Lynch they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Merrill Lynch stock.

171.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plans' investment in Merrill Lynch stock.

**E.    Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Merrill Stock in the Plans.**

172.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

173.    During the Class Period, on information and belief, Defendants made direct and indirect communications with participants in the Plans which included statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, and press releases that were incorporated by reference into Plan Documents and/or Plan-related materials, and, thus, were Plan communications undertaken in a fiduciary capacity, in which Defendants failed to disclose that Company stock was not a prudent retirement investment.    The Company regularly communicated with employees, including

participants in the Plans, about the performance, future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plans.

174.    Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

(a).    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b).    Out of loyalty, employees tend to invest in company stock;

(c).    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d).    Employees tend not to change their investment option allocations in the plan once made;

(e).    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f).    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g).    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf);    Nellie    Liang    &    Scott

Weisbenner, *Investor Behavior and the Purchase Of Company Stock in 401(k) Plans - the Importance of Plan Design*, Board of Governors for the Federal Reserve System Finance and Economics    Discussion    Series,    No.    2002-36    (2002)    (available    at http://www.federalreserve.gov/pubs/feds/2002/200236/200236 pap.pdf).

175.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plans and their participants from their heavy investment in an imprudent retirement vehicle, Merrill Lynch stock.

176.    In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plans could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plans.

177.    Specifically, Defendants failed to provide the Plans' participants with complete and accurate information regarding the Company's unduly risky sub-prime and CDO investments, the true impact of such investment on the Company financial condition, and the dire circumstances such investments have created for the Company, and the Plans' investment in Merrill Lynch stock.    As such, the participants were not informed of the true risks of investing their retirement assets in the Plans in Merrill Lynch stock.

**F.    Defendants Suffered From Conflicts of Interest.**

178.    As ERISA fiduciaries, Defendants are required to manage the Plans' investments, including the investment in Merrill Lynch stock, solely in the interest of the participants and

51

beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

179.    Conflicts of interest abound when a company that invests plan assets in company stock founders. This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other. As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'" *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir.1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

180.    Defendants failed to investigate whether to take appropriate and necessary action to protect the Plans, and instead, chose the interests of the Company over the Plans by continuing to offer Merrill Lynch stock as an investment option for the Plans, and maintain investment in Merrill Lynch stock in the Plans. Moreover, while certain Defendants, such as Defendant O'Neal, dumped over 474 thousand shares of Merrill Lynch stock that he personally held for proceeds of over $44.5 million during the Class Period, they did nothing to protect the Plans from losses due to the Plans' imprudent investment in Merrill Lynch stock.

## VII. THE RELEVANT LAW

181.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

182.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part,

any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

183.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

184.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

185.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Merrill Lynch Stock Fund, which invested in Merrill Lynch stock, to ensure that each investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the

participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

186.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part,

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

187.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party

could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .  [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

188.  Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## VIII.  ERISA § 404(c) DEFENSE INAPPLICABLE

189.  ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

190.  ERISA § 404(c) does not apply here for several reasons.

191.  First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Merrill Lynch stock as an investment option

in the Plans as this is not a decision that was made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

192.    Second, ERISA § 404(c) does not apply to any Merrill Lynch stock in the Traditional ESOP Plan, or any component of the others Plans which purport to be ESOPs, as Plan participants do not have any control over the decision to invest Plan assets in Merrill Stock in such Plan and Plan components. Instead, the Plan fiduciaries controlled such assets.

193.    Third, even as to participant-directed investment in Merrill Lynch stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Merrill Lynch stock.    *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions").    As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Merrill Lynch stock as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investment.

194.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plans, the Plaintiffs and the Class (as defined below) for losses caused by the Plans' investment

in Merrill Lynch stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

## IX. DEFENDANTS' INVESTMENT IN MERRILL LYNCH STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

195.    Some courts have applied a presumption of prudence to decisions by plan fiduciaries to invest plan assets in company stock in plans that qualify as "ESOPs" under the Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder. The presumption is based on the dual purpose of an ESOP to allow employee ownership on the one hand, and save for retirement on the other. *Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d Cir. 1995) (explaining dual purpose of ESOP plans and adopting presumption of prudence to balance these concerns).

196.    As these courts have made clear, when a presumption of prudence applies, "[a] Plaintiffs may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

197.    Plaintiffs dispute that the Plans qualify as ESOPs. Nonetheless, even if the Merrill Lynch Stock Fund components of the Plans are deemed ESOPs, any presumption of prudence on the part of Defendants' decisions to make and maintain investment in Merrill Lynch stock is overcome by the facts alleged here, including, among other averments:

- A precipitous stock price decline from over $95 to under $52 during the Class Period;

- Risk of further imminent collapse of the Company's stock price based on the Company's practices as described in detail herein;

- Serious, if not gross, mismanagement evidenced by, among other things,

57

- rapidly expanding into a high-risk finance sector without establishing the requisite business skill set to manage and understand the corresponding risks;

- persisting in its aggressive growth of the CDO business, despite clear indicators, including its own projections, weighing against continued growth;

- inflating the value of the Company's asset-backed portfolio by calculating their worth without regard to actual market conditions; and

- artificially inflating the Company's share price, through improperly accounting for its CDO portfolio and other related subprime holdings and incomplete and inaccurate statements regarding the dire circumstances faced by the Company as a result of its improper actions.

198.    The imprudence of continued investment by Defendants in Merrill Lynch stock during the Class Period under the circumstances present here is recognized in Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. 2509.94-1. Defendants had available to them investment alternatives to Merrill Lynch stock that had either a higher rate of return with risk commensurate to Merrill Lynch stock or an expected rate of return commensurate to Merrill Lynch stock but with less risk.

199.    Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in Merrill Lynch stock, and, effectively, to do nothing at all to protect the Plan from significant losses as a result of such investment during the Class Period.

## X. CAUSES OF ACTION

A.    **Count I:  Failure to Prudently and Loyally Manage the Plans and Assets of the Plans**

200.    Plaintiffs incorporate by this reference the paragraphs above.

201.    This Count alleges fiduciary breach against the following Defendants:    the Compensation Committee Defendants, the Investment Committee Defendants, and the Senior Vice President, Leadership and Talent Management Defendant (the "Prudence Defendants").

202.    As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

203.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included, on information and belief, managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plans and directing the trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.

204.    Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, during the Class Period, these Defendants knew or should have known that Merrill Lynch common stock no longer was a suitable and appropriate investment for the Plans, but was, instead, a

highly speculative and risky investment in light of the Company's improper business practices, serious mismanagement, misstatement and omissions that caused the price of Merrill Lynch stock to be artificially inflated, and the impending collapse of the price of the stock as a result of these dire circumstances. Nonetheless, during the Class Period, these Defendants continued to offer Merrill Lynch stock as an investment option for participant contributions, provide Retirement Contributions in Merrill Lynch stock, and maintain the Plans' enormous investment in the stock.

205.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

206.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in Merrill Lynch stock even in light of the losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plans. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Merrill Lynch stock under these circumstances.

207.    The Prudence Defendants' decisions respecting the Plans' investment in Merrill Lynch stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have

made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and assets in Merrill Lynch stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

208.    The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

209.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

210.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into

consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  o The composition of the portfolio with regard to diversification;

  o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  o The projected return of the portfolio relative to the funding objectives of the plan.

211.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Merrill Lynch stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plans: (a) rapidly expanding into a high-risk finance sector without establishing the requisite business skill set to manage and understand the corresponding risks; (b) persisting in its aggressive growth of the CDO business, despite clear indicators, including its own projections, weighing against continued growth; (c) inflating the value of the Company's asset-backed portfolio by calculating their worth without regard to actual market conditions; and (d) artificially inflating the Company's share price through improperly accounting for its CDO portfolio and other related subprime

holdings, and through incomplete and inaccurate statements regarding the dire circumstances faced by the Company as a result of its improper actions.

- The risk associated with the investment in Merrill Lynch stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plans' participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plans' participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plans or any participant from investing the Plans' assets in Merrill Lynch stock; and

- Further, knowing that the Plans were not diversified portfolios, but were heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

212.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the compensation and tenure of the Prudence Defendants was tied to the performance of Merrill Lynch stock and/or the publicly reported financial performance of Merrill Lynch. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a

63

disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

213.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investment in Merrill Lynch; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Merrill Lynch stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to Merrill Lynch's inappropriate practices; and by otherwise placing their own and Merrill Lynch's improper interests above the interests of the participants with respect to the Plans' investment in Merrill Lynch stock.

214.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plans suffered significant losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost approximately two billion dollars of retirement savings.

215.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II:  Failure to Monitor Fiduciaries**

216.    Plaintiffs incorporate by this reference the allegations above.

217.    This Count alleges fiduciary breach against the following Defendants: the Director Defendants and the Senior Vice President, Human Resources Defendant (the "Monitoring Defendants").

218.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

219.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| HR Defendant | Investment Committee Defendants and Administrative Committee Defendants. | ¶¶ 99 - 100 |
| Director Defendants | Compensation Committee Defendants; Senior Vice President, Human Resources; and Senior Vice President, Leadership and Talent Management. | ¶¶ 90 - 93 |

220.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

221.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on"

fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

222.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

223.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Merrill Lynch's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Merrill Lynch stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Merrill Lynch stock despite their knowledge of practices that

rendered Merrill Lynch stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

224.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost approximately two billion dollars of retirement savings.

225.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries.**

226.    Plaintiffs incorporate by this reference the allegations above.

227.    This Count alleges fiduciary breach against Merrill Lynch and the Administrative Committee Defendants (the "Communications Defendants").

228.    At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

229.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included the communications and material disclosures to the Plans' participants and beneficiaries.

230.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plans' investment options, including investment in Merrill Lynch stock.

231.    Because investments in the Plans were not diversified (*i.e.* the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested heavily in Merrill Lynch stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Merrill Lynch stock.

232.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Merrill Lynch's serious mismanagement and improper business practices and public misrepresentations, and the consequential artificial inflation of the value of Merrill Lynch stock, and, generally, by conveying incomplete information regarding the soundness of Merrill Lynch stock and the prudence of investing and holding retirement contributions in Merrill Lynch equity. These failures were particularly devastating to the Plans and their participants; a heavy percentage of the Plans' assets were invested in Merrill Lynch stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

233.    Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plans' investment in Merrill Lynch stock.

234.    Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plans' participants.

235.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

236.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

237.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**D.    Count IV:  Co-Fiduciary Liability**

238.    Plaintiffs incorporate by this reference the allegations above.

239.    This Count alleges co-fiduciary liability against the following Defendants: all Defendants (the "Co-Fiduciary Defendants").

240.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

241.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

242.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

243.    Merrill Lynch, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to Merrill Lynch as a matter of law.

244.    Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Merrill Lynch's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plans.

245.    **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Merrill Lynch knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan participants.  Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Merrill Lynch stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

246.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

247.    The Monitoring Defendants' failure to monitor the Prudence Defendants, particularly the Administrative and Investment Committees, enabled those committees to breach their duties.

248.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost approximately two billion dollars of retirement savings.

249.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by

their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XI. CAUSATION

250.    The Plans suffered nearly two billion dollars in losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Merrill Lynch stock during the Class Period, in breach of Defendants' fiduciary duties.

251.    Defendants are liable for the Plans' losses in this case because: (a) the Traditional ESOP's investment in Merrill Lynch stock was the result of the Prudence Defendants' decision to invest Company contributions in Merrill Lynch stock; and (b) as to the portion of 401(k) Plan's and the RAP's assets invested in Merrill Lynch stock as a result of participant and/or Company contributions, the Prudence Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

252.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Merrill Lynch stock as an investment alternative when it became imprudent, and divesting the Plans of Merrill Lynch stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that they, and indirectly, the participants suffered.

## XII. REMEDY FOR BREACHES OF FIDUCIARY DUTY

253.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Merrill Lynch stock during the Class Period.

254.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

255.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

256.    With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them. Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Merrill Lynch stock that the Plans would have acquired had the Plan fiduciaries taken appropriate steps to protect the Plans. The Court should adopt the measure of loss most advantageous to the Plans. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

257.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans

resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

258.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## XIII. CLASS ACTION ALLEGATIONS

259.    **Class Definition.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

260.    All persons, other than Defendants, who were participants in or beneficiaries of the Plans at any time between January 18, 2007 and the present and whose accounts included investments in Merrill Lynch stock.

261.    **Class Period.** The fiduciaries of the Plans knew or should have known at least by January 18, 2007 that the Company's material weaknesses were so pervasive that Merrill Lynch stock could no longer be offered as a prudent investment for retirement Plans.

262.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the

Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, based on the Plans' Form 5500s for Plan year 2005, over 57 thousand participants or beneficiaries in the SIP, and over 47 thousand participants in both the RAP and the Traditional ESOP.

263.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plans have suffered losses and, if so, what is the proper measure of damages.

264.    **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), their claim on behalf of the Plans is not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

265.    **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action,

complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

266. **Rule 23(b)(1)(B) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

267. **Other Rule 23(b) Requirements.** Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans

resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Merrill Lynch stock;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated:  December 6, 2007

                          Respectfully submitted,


                          COHEN, MILSTEIN, HAUSFELD
                          & TOLL, P.L.L.C.


                          By: _____
                              Lynda J. Grant (LG-4784)
                              150 East 52nd Street
                              Thirtieth Floor
                              New York, NY 10022
                              Telephone:  (212) 838-7797
                              Facsimile:  (212) 838-7745

**ZIMMERMAN REED, P.L.L.P.**
Carolyn G. Anderson
Timothy J. Becker
Anne T. Regan
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, Minnesota 55402
Tel: 612.341.0400
Fax: 612.341.0844

**LOCKRIDGE GRINDAL NAUEN, P.L.L.P.**
Gregg M. Fishbein
100 Washington Avenue So., Suite 2200
Minneapolis, Minnesota 55401
Tel: 612.339.6900
Fax: 612.339-0981

**KELLER ROHRBACK L.L.P.**
Lynn L. Sarko
Derek W. Loeser
Erin M. Riley
Tyler L. Farmer
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
*Counsel for Plaintiffs*